316 P.2d 557

The ATLANTIC REFINING COMPANY, Inc., Plaintiff-Appellee,

v.

Emily M. Tate JONES and George O. Tate, Defendants-Appellants.

No. 6208.

Supreme Court of New Mexico.

Oct. 9, 1957.

238

Dale B. Dilts, Albuquerque, for appellants.

Hervey, Dow & Hinkle, Roswell, for appellee.

SADLER, Justice.

This appeal is prosecuted by Emily Tate Jones from a judgment rendered against her by the district court of Lea County, New Mexico, in a suit to quiet title to certain oil and gas leasehold interests on land in Lea County, New Mexico.

The properties in which the defendant named claimed a community interest by virtue of being the wife of William U. Tate at the time he acquired an interest in them are described in the trial court's findings and decree. They are undivided fractional mineral interests, very small in extent, neither their size nor the land in which they exist being important to a determination of the legal questions involved on this appeal.

The facts are simple. The defendant, Emily Tate Jones, married William Tate, also a defendant named in the complaint, in Wichita, Kansas, on May 6, 1917. They were living in Albuquerque, New Mexico, in the year, 1928, when they removed to Lovington, New Mexico, where the husband engaged in the oil business. Thereafter, conditions in the family being none too good at Lovington, taking her two sons with her, the wife returned to the old home in Wichita, Kansas, where her parents resided.

Within two months of the arrival back at her old home, Mrs. Tate then being her name, initiated a divorce action against her husband by filing a complaint containing all essential allegations necessary to give the court jurisdiction to entertain the suit and grant the relief prayed. Proper service having been had in the divorce action, the trial court in due course awarded a decree in favor of the plaintiff.

Notwithstanding the decree of divorce, within the period of a few months thereafter, Mrs. Tate returned to New Mexico, where her husband had continued to reside and, no doubt, again lived with him. This is reflected by a separate maintenance action she instituted against him in the district court of Bernalillo County, not too long after returning there. Some time later and in 1933, the defendant, William U. Tate, disappeared and was not again heard from until about 1955. In the meantime, his wife,

or former wife Emily Tate, had filed a suit to have him declared deceased.

The mineral interests involved in this suit with which William U. Tate became connected, were acquired by him during a period subsequent to the purported divorce and prior to his disappearance from Lea County, New Mexico, some time in the year 1933.

While we have before us a rather large record, with extensive plats and other exhibits that were before the trial court, there is not the complexity and confusion a first view of the record suggests, when the issues are narrowed to those actually remaining for decision by us on this appeal. We think the attorneys for the plaintiff (appellee) in their "Objections to Statement of the Case" have given us a fairly accurate picture of what is actually before us for decision. Accordingly, we take the liberty of quoting it as follows:

"Objections to the Statement of the Case

"Basically, we have no objections to the Statement of the Case as contained in Appellant's Brief in Chief. However, we would like to point out one or two additional matters which we deem relevant, to-wit:

"1. In the trial Court, the issues involved 3 points:

"(a) The validity of a judgment release purportedly signed by the Appellant, Emily Tate Jones. This issue was found in the favor of the Plaintiff, and apparently Appellant is not appealing this question.

"(b) Whether or not William U. Tate, Sr. is still alive; the Plaintiff maintained that he was, and the Appellant maintained that he was deceased. This issue was found in favor of the Plaintiff and here again apparently the Appellant is not appealing this question.

"(c) The validity of a Kansas divorce between Emily Tate Jones and William U. Tate, Sr.; the Kansas divorce was admitted into evidence, and the trial court ruled that such proceeding was entitled to full faith and credit in this action, and its validity could not be attacked by Appellant herein. This is the issue involved in this appeal.

"2. Appellant states at page 5 of her Brief in Chief that 'all of the properties mentioned in the Complaint' are involved in this action. We believe this is a clerical error since it was stipulated that only approximately ¼ of the minerals were actually in litigation, the other ¾ interest admittedly belonging to the Plaintiff.

"3. Although George O. Tate is a party appellant in this Court, he appears to be only a nominal Appellant, and the 'real party in interest' Appellant is Emily Tate Jones."

It may be well to point out that title to none of the lands involved in the suit out of which this appeal arose was ever vested in

either William U. Tate, or Emily Tate Jones. True enough, title to such lands was at one time vested in one Dorothy Heard, and she and Mr. Tate entered into two Declarations of Interest, the first of which was recorded on June 27, 1932.

Thus it was that William U. Tate acquired a $9/66$ undivided mineral interest in certain lands, all of which, except $9/66$ of the minerals in the S½ of SE¼, SE¼ of SW¼ of Section 27 and NW¼ of NE¼ of Section 34, was duly sold under execution to Lea County State Bank of Lovington in an action or suit in the district court of Lea County, in cause No. 1759 on the civil docket of said court. This action was a suit on a note executed by William Tate, Sr., on March 18, 1931. If the Tates were married at that time, as the wife insists, then the note represented a community debt and Tate was acting for the community in his appearance in the case and the judgment and execution bind her. Strong v. Eakin, 11 N.M. 107, 66 P. 539; Brown v. Lockhart, 12 N.M. 10, 71 P. 1086.

Conversely, if the Tates were no longer married in 1931, as proclaimed by the Kansas divorce action, then the defendant, Emily Tate Jones, could have no interest in the lands sold under execution issued on the judgment in the Lea County action. Under either theory, then, the defendant, Emily Tate Jones, could not now have any interest in the minerals passing through this former action and execution sale. So much for any claim of present interest in mineral interest in such lands.

Accordingly, this brings the defendant's claim, down to that of a community interest in $9/66$ of the minerals in the S½ of SE¼, SE¼ of SW¼, Section 27, and the NW¼ of NE¼ of Section 34, all in Township 15 South, Range 35 East, N.M.P.M. William U. Tate on June 10, 1955, conveyed this mineral interest to Robert C. Dow. The plaintiff below, appellee before this Court, holds its title to the oil and gas leasehold estate from Mr. and Mrs. Robert C. Dow to W. G. Ross, dated June 22, 1955, for which the court found the lessee named paid a valuable consideration. Since William U. Tate alone joined in the conveyance to Robert C. Dow it is easy to see where effect of the Kansas decree becomes important as to the lands, or interest conveyed.

The plaintiff makes a dual defense to the attack of defendant, Emily Tate Jones, on the Kansas judgment. She appreciates, of course, that unless she can dissipate the effect of that judgment in the collateral attack she makes upon it, she has no standing before the court in claiming a community interest in property acquired by her divorced husband subsequent to date of the divorce. So it is, she asserted below and claims here she is not bound by the decree because a fraud on the court was perpetrated in securing it in that she was not a bona fide resident of Kansas at the time she began and ended her suit.

The plaintiff answers by asserting the Kansas decree, giving every proof of validity by its recitals, is entitled to full faith and credit in all the courts of this state against the collateral attack defendant seeks to make upon it; and, (2) that granting the defendant perpetrated a fraud upon the Kansas court by basing the decree secured on false and perjured testimony as to residence, the defendant attacking it being the one guilty of the fraud perpetrated upon the Kansas court, is in no position to have it set aside and its effect nullified now that it proves disadvantageous to her. Accordingly, she is estopped to claim its invalidity upon the ground she does.

Whatever way we view the matter, we can see no ground, legal or equitable, upon which the complaining defendant may hope to establish a mineral interest in the lands involved. Any claim of a community interest as the wife of William U. Tate is met at the threshold by the Kansas decree, prosecuted at her own instance and which, if given full faith and credit in the collateral attack she makes upon it, debars her of any claim of community interest through her former husband.

■ Viewed otherwise, and shorn of the immunity to attack, enjoyed under the "full faith and credit" clause of the federal constitution, we, nevertheless, find the defendant wife barred from showing any benefit or advantage from the fraud inherent in the Kansas decree, because as a plaintiff in the suit she, herself, is to be charged with, and held responsible for, the fraud admittedly practiced on the Kansas court in procuring the fraudulent decree.

So it is we are merely called upon to determine and declare whether, first, the Kansas decree is entitled to protection against the collateral attack made upon it. And, secondly, whether so or not, the defendant wife be estopped to make the attack she does, by reason of her part in the fraud practiced upon the Kansas court.

■ That the challenge by the defendant, Emily Tate Jones, to validity of the Kansas decree represents a collateral attack on same can hardly be doubted. See, City of Albuquerque v. Huddleston, 55 N.M. 240, 230 P.2d 972; Kutz Canon Oil & Gas Co. v. Harr, 56 N.M. 358, 244 P.2d 522. Indeed, neither party questions that the present attack is collateral. Such being true, what presumptions of regularity and validity attend the judgment of a court of general jurisdiction when so attacked? In McDonald v. Padilla, 53 N.M. 116, 202 P.2d 970, 973, we said:

"* * * every presumption not inconsistent with the record, is to be indulged in favor of the jurisdiction of courts of general jurisdiction whose judgments are collaterally attacked; and their judgments, though void for want of jurisdiction and would be so held on direct attack, cannot be ques-.

tioned on that ground when attacked collaterally, unless the lack of jurisdiction appears affirmatively in the judgment roll."

The doctrine as thus laid down in McDonald v. Padilla is supported by our decisions in Bounds v. Carner, 53 N.M. 234, 205 P.2d 216; City of Albuquerque v. Huddleston, supra; Jencks v. Goforth, 57 N.M. 627, 261 P.2d 655; Adams & McGahey v. Neill, 57 N.M. 782, 276 P.2d 913, 51 A.L.R. 2d 830.

█ Tested by the principles quoted from McDonald v. Padilla, supra, we turn to the record to ascertain whether the Kansas decree comes within the protection of its principles. First, we ascertain from Kansas statutes that the district courts of that state may grant a divorce for a number of grounds, including "sixth, extreme cruelty." G.S.1949, 60–1501. The complaint in the Kansas suit alleges the defendant was guilty of "extreme cruelty." The general statutes of Kansas further require of the plaintiff in a divorce action residence in good faith in the state for one year as well as in the county where and when the action is filed. The divorce complaint in the Kansas suit, which was verified by the defendant alleges that "she has been an actual bona fide resident of the state of Kansas for more than one year last past and is now a resident of Sedgwick County, Kansas."

It thus appears that the district court of Sedgwick County, Kansas, had the requisite jurisdiction of the subject matter to grant the Tate divorce in 1929, and that such jurisdiction of the subject matter *appears affirmatively on the judgment roll.*

█ Next, we turn to the jurisdiction of the person acquired by the Kansas court in the Tate divorce proceeding. As already shown, the defendant here actually instituted, personally, the divorce action, thereby submitting herself to the jurisdiction of the court by filing her complaint in the district court of Sedgwick County, Kansas, on May 29, 1929. The statutes of Kansas require service of process in divorce suits, based on an affidavit of nonresidency, and publication of notice of suit with a lapse of not less than 41 days from the date of first publication to the default date. The defendant here as a plaintiff in the divorce proceeding filed an affidavit reciting that she did not know where the defendant was and publication was had on defendant, Tate, commencing on June 1, 1929, with a default date set for July 13, 1929. Judgment was actually taken on August 31, 1929. Thus, there was a lapse of more than 41 days between the date of first publication and the default date.

Kansas required only three weeks of publication, but otherwise their statutes on constructive service in divorce actions are very much like those in New Mexico. It therefore appears that at the date of the final decree, the district court of Sedgwick County,

Kansas, had jurisdiction of the persons of both Emily D. Tate and William U. Tate sufficient to authorize it to grant the divorce, and this fact *appears affirmatively on the judgment roll.*

■ In view of the foregoing it impresses us that the Kansas decree is invulnerable to the attack made upon it in this collateral proceeding and upon that ground alone the judgment of the district court is entitled to affirmance as to all the land, or interests, involved on this appeal. We are not unmindful of the fact that the case of McDonald v. Padilla, supra, has been criticized and departed from in one or more of our later decisions, see Adams & McGahey v. Neill, supra, but not in any particular in which we cite approvingly and rely upon it in the conclusions here announced.

Counsel for the defendant, Emily Tate Jones, places much reliance on the two well known North Carolina cases in the United States Supreme Court, cited under the title of Williams v. State of North Carolina, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273, and 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366.

We do not think the opinion of the nation's highest court in either of these two cases is contrary to the conclusions we reach, and we virtually follow plaintiff's counsel in distinguishing them.

In the first place, the Williams case was a criminal case. The Supreme Court of the United States held that in an action of such a nature North Carolina jurors could inquire into the jurisdiction found by the Nevada courts, and that the recitations in the Nevada decree did not foreclose inquiry into the question. The Supreme Court further stated, however, that the Nevada decree was " 'prima facie evidence' sufficient to warrant a finding of domicil in Nevada." 65 S.Ct. 1098.

The error in attempting to apply the Williams case to the instant one is two-fold. In the first place, the Williams case actually holds that a party who had concluded to defraud the Nevada court in a divorce action on the question of jurisdiction was estopped to relitigate the point, *but that such estoppel did not affect the right of the sovereign state of North Carolina in a criminal action.* Secondly, the Williams case deals with a direct attack on the Nevada divorce whereas in this instance we are dealing with a collateral attack by the very one who perpetrated the fraud as to jurisdiction and under the Williams case itself the Kansas decree is entitled to full faith and credit.

Having determined that the Kansas decree in the divorce action initiated there by defendant is invulnerable to the collateral attack here made upon it, we might well cease our labors upon announcing an affirmance of the judgment below. Nevertheless, the estoppel invoked against the defendant in her attempt to derive advantage from the fraud practiced on the Kansas

court has been argued with such vigor that we can not refrain from announcing our conclusion on the subject.

In American Law Institute (Perm. Ed.) treatment of Conflict of Laws, § 112, it is said:

"The validity of a divorce decree cannot be questioned in a proceeding concerning any right or other interest arising out of the marital relation, either by a spouse who has obtained such decree of divorce from a Court which had no jurisdiction or by a spouse who takes advantage of such decree by remarrying."

See, also, Krause v. Krause, 282 N.Y. 355, 26 N.E.2d 290; Hunter v. Hunter, Sup., 24 N.Y.S.2d 76; McNeir v. McNeir, 178 Va. 285, 16 S.E.2d 632; Smith v. Smith, D.C., 36 F.Supp. 412; Oberstein v. Oberstein, 217 Ark. 80, 228 S.W.2d 615, 622.

We are not unmindful of our decision in Golden v. Golden, 41 N.M. 356, 68 P.2d 928, where the foreign decree was exposed to impeachment, even by one of the parties who was connected with the fraud. We find the factor of public policy which played a large part in that case wanting in the case at bar. Furthermore, here no rights of an innocent party who relied upon the verity of the Kansas decree. We find no conflict between the Golden case and our present holding that defendant is estopped to challenge the Kansas decree.

See, also, on question of estoppel cases of In re Madison, 32 N.M. 252, 255 P. 630, and State ex rel. Fitzhugh v. City Council of City of Hot Springs, 56 N.M. 118, 241 P.2d 100.

It follows from what has been said that the judgment of the trial court is free from error and should be affirmed.

It is so ordered.

LUJAN, C. J., and McGHEE, COMPTON and KIKER, JJ., concur.